UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTIAGO COVARRUBIAS,<br><br>                   Petitioner,<br><br>v.<br><br>M.E. SPEARMAN, Warden,<br><br>                   Respondent. | Case No.: 19-CV-546-JLS(WVG)<br><br>REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS |

      On March 15, 2019, Petitioner Santiago Covarrubias filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his criminal conviction of first-degree murder under California Penal Code § 187(a), along with a finding of personal use of a firearm under California Penal Code § 12022.53(d), and the subsequent sentence imposed for fifty years-to-life in state prison.

      Petitioner claims (1) there is insufficient evidence corroborating his accomplice's testimony; (2) the trial court erred by admitting evidence of his ex-girlfriend's "equivocal" identification of him when she was shown security footage by police; (3) the trial court erred by allowing a detective to opine on similarities between the suspect's description, photographs of the suspect, and the composite sketch; and (4) there are sentencing errors consisting of correcting the abstract of judgment for a clerical error and remand for

resentencing in light of new legislative authority that allows for broader trial court discretion with respect to striking firearm enhancements.

Respondent contends that there is no basis for habeas relief because (1) corroboration of accomplice testimony is not a federal claim; (2) and (3) admission of evidence is not a federal claim for which relief may be granted because the Supreme Court has not yet addressed the admission of evidence, even prejudicial evidence; and (4) Petitioner was already granted relief as to the sentencing errors by the state courts.

For the reasons set forth below, the Court RECOMMENDS the Petition be DENIED.

## I. BACKGROUND

A jury found Santiago Covarrubias guilty of first-degree murder with an attendant personal gun enhancement. *See* Cal. Penal Code §§ 187(a), 12022.53(d). The trial court sentenced Covarrubias to a term of 50 years-to-life in prison. Covarrubias appealed, raising the same claims in the state court that he raises now. The California Court of Appeal rejected Claims 1-3 and granted appropriate relief for Claim 4. The California Supreme Court summarily denied Covarrubias's petition for review without comment.[1]

This Court gives deference to state court findings of fact and presumes them to be correct unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35 (1992) (holding that findings of fact are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal's opinion on Petitioner's direct appeal, affirming the judgment of the trial court:

---

[1] In its Answer, Respondent stipulated that the First Amended Petition "appears to be timely and exhausted." (ECF No. 15 at 2.) Furthermore, California law prohibits the use of a state habeas claim as a "second appeal" of claims raised on direct appeal. *See In re Waltreus*, 62 Cal. 2d 218, 225 (1965); *In re Winchester*, 53 Cal. 2d 528, 532 (1960), *superseded by statute on other grounds*. Because Petitioner raises the same claims as his direct appeal in state court, and the Respondent stipulated to exhaustion in its filings, the Court considers the exhaustion requirement of 28 U.S.C. § 2254(b) to be satisfied.

*Murder and Initial Investigation*

Damon Green and D.B. were coworkers and friends. After an evening at a nightclub, the two men stopped to eat at a taco shop in a small shopping center in the Mid City area around 1:30 or 2:00 a.m. on March 20, 2007. D.B. observed a group of four Hispanic males enter the taco shop. Two of them left immediately, while the other two ordered food and sat at the table next to D.B. and Green. Green struck up a conversation with one of them, whom D.B. later described as "the shooter." D.B. and the shooter's friend mostly sat quietly during the conversation.

The conversation started off friendly, but became more intense. Green and the shooter discussed the fact they were both fathers, and Green expressed his view that people should learn Spanish because "Spanish is the future, and stuff like that." D.B. saw that the shooter "was getting agitated and irritated," and "felt intimidated and disrespected" by Green's size—6'3" and 272 pounds. D.B. apologized to the shooter on Green's behalf and told Green to leave him alone.

The shooter asked Green where he was from, and Green responded he was from Wyoming or Montana. Green was just "messing with" him. Green asked the shooter where he was from, and "the shooter said he was from right here, 'you know, man, I'm from East Diego.'" At the time, this did not "trigger" D.B. to think about gangs, but he later testified at trial that he understood the shooter to be indicating he was a member of the East San Diego criminal street gang. This concerned D.B., who told Green, "It's time to go."

But Green kept talking to the shooter, asking whether he dealt drugs. The shooter responded, "yeah, you know, I do what I got to do." Green asked if the shooter had any drugs with him, which made the shooter "real agitated and upset" that Green was "being nosey." Green then asked the shooter for some drugs, which prompted the shooter to standup and reply, "Okay, I'll go get some."

D.B. did not think the shooter was going to get drugs; he thought he was going to get a gun. D.B. told Green, "It's time to get out of here, "but Green wanted to get a slushy drink at the donut shop next door. D.B. warned other people in the taco shop to get out. D.B. got in his car and honked at Green, telling him, "Come on, let's go."

After a few minutes, D.B. saw the shooter and his friend walk around from behind the donut shop. As Green exited the donut shop, the shooter confronted him with a gun and said, "I got the shit right now . . . , what's up." Green ran back inside the donut shop and slammed the door, but the shooter shot through the glass door and ran in after Green. The shooter fired four or five shots as Green ran to hide behind the counter. After the shooting, the shooter left through the broken glass window and ran with his friend in the direction they had come. Security cameras in the donut shop recorded parts of the incident.

D.B. ran inside the donut shop and called 911. Green was bleeding, unconscious, and "[h]is eyes looked like he was dead." Green died from gunshot wounds to his buttock and thigh, which severed his femoral artery and femoral veins.

At the crime scene, D.B. described the shooter to police as a Hispanic male in his early 20's, measuring about 5'8" tall, and weighing about 220 pounds. He had a shaved head and a small goatee, and was wearing Converse shoes, blue pants, a long-sleeve white shirt with vertical stripes, a baseball hat, and a "flashy" diamond earring in at least one ear.

D.B. described the non-shooter to police as a Hispanic male in his early 20's who was "approximately the same height" as the shooter, but about 20 pounds lighter. The friend also had a shaved head, and he wore white Converse shoes, blue jeans, and a short-sleeved t-shirt. D.B. also said the non-shooter had "crooked" teeth that were "wedged together."

D.B. told police he would be able to identify the shooter, so a detective showed him a photo lineup of potential

suspects. D.B. circled and initialed one of the photos, and told the detective he was "100% sure that that looks like the guy/same face—none of the others match." However, the person whose photo he circled was incarcerated at the time of the murder. D.B. clarified at trial that he "[wasn't] identifying him as the shooter, but [as] someone that *looked like* him." (Italics added.) D.B. worked with a detective to develop a composite sketch of the shooter, which was admitted in evidence at trial.

Police interviewed the donut shop employee who was working when the shooting occurred. The employee said he could not identify the shooter because he (the employee)dropped to the floor when the shooting started outside the donut shop. After the shooting, he saw two "20-something" Hispanic males run north. One of the men had a "medium build," a beard that "came down the side of his face and then around to the front, "combed-back hair, and he was wearing a baseball cap. The other man was also wearing a baseball cap.

Police also interviewed the taco shop employee who was working the night of the shooting. He told police he took the Hispanic men's food order that night, that they ordered in English and Spanish, "but their Spanish wasn't very good." The employee said he is 5'7"tall, and the Hispanic men "were just slightly taller than" him, maybe 5'8"or 5'9,"and "appeared young." At trial, the employee testified on direct examination that he did not take the Hispanic men's order (he only cooked their food), and he was never "in a position where [he] could see how tall they were." The employee testified the suspects never returned to the taco shop, and Covarrubias was not one of them.

The taco shop employee directed police to the trash left by the two Hispanic men. Forensic technicians processed the trash remains for DNA and obtained a sample, but it generated no immediate hits in the CODIS database. Technicians also processed the taco shop's glass front door for fingerprints, but none of the prints belonged to a Hispanic male.

5

19-CV-546-JLS(WVG)

With no further leads, the investigation went cold.

*Cold Case Investigation*
In 2012, a DNA sample entered into the CODIS database generated a hit on the 2007 taco shop sample. The DNA matched a Hispanic male named Martin Villalpando. Detectives interviewed him, but he claimed to have no memory of the 2007 shooting.

Detectives learned through DMV and other records that Villalpando drove and later owned a 1995 Cadillac registered to a woman who lived with Covarrubias, and that Covarrubias had also been documented driving the car. Lori Adams, a San Diego Police "cold case" detective working in the homicide division, found it significant that Covarrubias lived about three blocks northwest of the taco shop because the shooting suspects ran from the crime scene in that direction.

Detective Adams obtained photographs of Covarrubias from 2004 and 2009, and testified she saw similarities between them and the composite sketch developed from D.B.'s description of the shooter. She said she also saw similarities between the sketch and photos of Villalpando. Another detective showed D.B. photo lineups that included photos of Covarrubias and Villalpando, but D.B. did not identify either of them. The detective also showed the taco shop employee a photo lineup that included Covarrubias's photo, but the employee did not identify Covarrubias. A DNA sample obtained from Covarrubias did not match any samples collected from the taco shop.

Detective Adams continued investigating the cold case for another two years, during which time she considered and ruled out many other suspects who matched witness descriptions or had contacts near the crime scene. In 2014, she interviewed Villalpando, who again claimed to have no memory of witnessing anything similar to the 2007 shooting.

In June 2015, Detective Adams and an investigator from the district attorney's office, Tony Johnson, interviewed M.R., who dated Covarrubias at the time of the murder. M.R. said Covarrubias sold drugs and was once a gang member. M.R. said she knew nothing about the 2007 shooting. But when the investigators showed her multiple still photos from the donut shop's security footage, M.R. "pointed to a picture and said, 'I don't know who that is, but I know who that is.'" When Detective Adams asked her to clarify, M.R. said the person in the hat "looks like Santiago [Covarrubias]." The district attorney investigator asked, "Well, if I told you that the person in the striped shirt was, in fact, Martin Villalpando, who do you think the other person would be?" After "a couple minutes, "M.R. said, "'Santiago,'" because "that's who Martin would be with."

About five weeks after M.R.'s interview, police arrested Villalpando. Detective Adams and Investigator Johnson interviewed Villalpando that day, but he offered no details on the shooting. However, about two months later, Villalpando met with investigators and the prosecutor, and identified Covarrubias as the shooter. As part of a plea deal, Villalpando agreed to testify truthfully at Covarrubias's trial in exchange for being allowed to plead guilty to voluntary manslaughter instead of first degree murder.

*Gang Evidence*
In light of D.B.'s statement that the shooter referenced "East Diego," the prosecution introduced evidence intended to show this was a reference to the East San Diego criminal street gang (sometimes referred to as the East Side gang) and that Covarrubias was affiliated with this gang (either directly, or through the affiliated Euclid Street gang).

Detective Ron Newquist, a homicide detective who oversaw the crime scene processing in this case, also testified about his extensive prior experience working patrol, crime suppression, and gangs in the Mid City area where the shooting occurred. Newquist said the East San

Diego gang was "one of the predominant street gangs in East San Diego, "with about 300 members in 2007. The shopping center where the shooting occurred was "definitely" in East San Diego gang territory.

Newquist also discussed the Euclid Street gang, which was documented as a criminal street gang in 1997, and had "morphed into East Side" by the early 2000's.

Addressing gang culture, Detective Newquist testified "respect" is "[e]verything." Gangs command respect through fear and intimidation, and retaliate against those who cooperate with police or testify against gang members. Newquist opined that if somebody at the taco shop said, "I'm from right here, East San Diego, "someone would infer the person is "claiming" to be a member of the East San Diego or East Side gang. He added that East San Diego gang members would "typically claim as "East Side or Diego, but not "East Diego" (as D.B. reported hearing the shooter say).

The parties stipulated to the following gang-related facts about Covarrubias: "On March 15, 2001, [Covarrubias]told . . . an employee at a nightclub, 'I'm from Eastside Euclid.' [¶] . . . [L]ater on March 15, 2001, when asked by [police] who he used to 'gang bang' with, [Covarrubias]said, 'The GDP. Or the Get Down Posse, a high school clique, and Euclid Street out by East San Diego.'" The trial court granted Covarrubias's motion in limine to exclude evidence regarding the March 15, 2001 incident that prompted the stipulation.

*Defense Case*
Covarrubias's defense focused on eyewitness misidentification and Villalpando's untrustworthiness and violent nature. Regarding misidentification, the defense presented forensic technicians who confirmed no fingerprints or DNA samples from the crime scene matched Covarrubias. Witnesses also testified they went with Covarrubias to the taco shop in years following the

| | |
|---|---|
| 1 | shooting and he did not appear apprehensive about being there. |
| 2 | |
| 3 | Regarding Villalpando's character, Covarrubias's brother testified about an incident in 2006 or 2007 when Villalpando threatened to kill an apartment security guard with a knife. The brother also acknowledged he and Covarrubias were once members of the Euclid Street gang, which was affiliated with the East San Diego gang. Both gangs use similar hand signs for the letter "E," and the brother identified Covarrubias in a photo" throwing up a Euclid gang sign." The brother also acknowledged that asking someone where they are from can be considered a gang challenge. |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | A friend of Villalpando's family testified Villalpando beat him with a baseball bat over a dispute about an allegedly defective car sound system the friend installed in Villalpando's car. |
| 12 | |
| 13 | |
| 14 | Several law enforcement witnesses testified about prior contacts with Villalpando, which records indicated may have been for gang-related activities. However, the officers had no independent recollection of the contacts, and Villalpando's gang connection, if any, was to the Del Sol or Ysidro gangs, not Euclid Street or East San Diego. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |

(Lod. 8, ECF No. 16-20 at 3-12.); *see also People v. Covarrubias*, No. D072041, 2018 Cal. App. Unpub. LEXIS 6245, at *3-14 (Cal. Ct. App. 2018).

## II. STANDARD OF REVIEW

This Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was filed after April 24, 1996 and Petitioner is in custody pursuant to the judgment of a state court. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016). Under AEDPA, a court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). The Ninth Circuit has further elaborated:

> An adjudication is contrary to clearly established Supreme Court precedent if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. It is an unreasonable application of clearly established Supreme Court precedent if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. An unreasonable application of federal law is different from an incorrect application of federal law. The federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. A state court's adjudication is unreasonable only if the federal habeas court concludes that no fairminded jurist could conclude that the adjudication was consistent with established Supreme Court precedent.

*Cain v. Chappell*, 870 F.3d 1003, 1012 (9th Cir. 2017) (quoting *Mann*, 828 F.3d at 1511-52) (internal citations and quotations omitted).

Where there is no reasoned decision from the highest state court to which the claim was presented, the court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's summary denial of review. *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).

### III. DISCUSSION

Petitioner contends that (1) there is insufficient evidence corroborating his accomplice's testimony; (2) the trial court erred by admitting evidence of his ex-girlfriend's identification of him when she was shown security footage by police and that her identification was "too equivocal"; (3) the trial court erred by allowing a detective to opine on similarities between the suspect's description, photographs of the suspect, and the composite sketch; and (4) there are sentencing errors consisting of correcting the abstract

of judgment for a clerical error and remand for resentencing in light of new legislative authority that allows for broader trial court discretion with respect to striking firearm enhancements.

Respondent contends that there is no basis for habeas relief because (1) corroboration of accomplice testimony is not a federal claim; (2) and (3) admission of evidence is not a federal claim for which relief may be granted because the Supreme Court has not yet addressed the admission of evidence, even prejudicial evidence; and (4) Petitioner was already granted relief as to the sentencing errors by the state courts. This Court agrees that Petitioner presents no claims that warrant issuance of the writ and takes each claim in turn below.

**A. Uncorroborated Accomplice Testimony is Not a Federal Claim for Which Relief Can Be Granted.**

Petitioner's claim that there is insufficient corroboration of his accomplice's testimony fails to satisfy the requirement of § 2254(d)(1) as "contrary to" any federal law or constitutional mandate subject to Federal habeas review. The Ninth Circuit has long upheld the admissibility of, and convictions based on, uncorroborated accomplice testimony. *See United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) (holding that the "uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face") (citing *United States v. Whitten*, 706 F.2d 1000, 1007 (9th Cir. 1983)). Furthermore, the Supreme Court has stated: "When we look to the procedural requirements of due process, the use of accomplice testimony is not catalogued with constitutional restrictions." *United States v. Augenblick*, 393 U.S. 348, 352 (1969).

Moreover, whether corroboration of an accomplice's testimony is a necessary component for admission in a state criminal proceeding is a matter of California state law. *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (Section 11117 "is a state law requirement that a conviction be based on more than uncorroborated accomplice testimony . . . . As a state statutory rule, and to the extent that the uncorroborated testimony

is not 'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal law.") (internal citations omitted. Accordingly, insofar as Petitioner contends that his conviction violates California Penal Code § 1111, this claim cannot serve as the basis for relief in a section 2254 proceeding. *See Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

Here, the California Court of Appeal adjudicated the claim over the question of admissibility, and therefore adjudicated the question presented. (Lodgment 16-20). Because this claim fails to raise an impetus for review under federal law, the Court recommends denial of the writ on Petitioner's first claim. *Accord Perez v. Muniz*, No. 18CV190-LJO-SKO (HC), 2019 U.S. Dist. LEXIS 7312, at *79 (E.D. Cal. Jan. 15, 2019) ("In the absence of Supreme Court precedent, Petitioner is not entitled to habeas relief, because the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law."); *Mackey v. Asuncion*, No. 15CV3165-HSG, 2018 U.S. Dist. LEXIS 168319, at *194 (N.D. Cal. Sep. 28, 2018) ("There is no clearly established federal law requiring juries to be instructed on the corroboration of accomplice testimony."); *Atchley v. Fox*, 2015 U.S. Dist. LEXIS 177705, at *64 (C.D. Cal. Oct. 6, 2015) ("The corroboration requirement of section 1111 is a matter of state law and does not implicate federal constitutional rights."), Report and Recommendation adopted by 2016 U.S. Dist. LEXIS 55573 (C.D. Cal. Apr. 26, 2016). The Court recommends denial of the Petition as to the first claim.

**B.     Admission of Improper Evidence at State Trials is Not a Federal Claim for Which Relief Can Be Granted**

In his second claim over the trial court's error as to the admissibility of evidence, Petitioner contends, as he did on direct appeal, that M.R.'s identification of him was "too equivocal" to act as corroborating evidence. In his third claim, Petitioner asserts that the trial court also erred in admitting Detective Adams' testimony regarding her opinion as to the similarities between descriptions of the suspect, the suspect, and a composite sketch of the suspect. Both claims pertain to rules and rulings on evidence, which, excluding any

question of federal law or constitutional due process, are determinations of state law immune from review by this Court.

Admissibility of evidence is largely governed by state law and trial court discretion. *See* Cal. Evid. Code § 352, Fed. R. Evid. § 403. "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68 (citing *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)); *see also Johnson v. Sandor*, 396 F. App'x 375, 376 (9th Cir. 2010), *Lopes v. Campbell*, 408 F. App'x 13, 15-16 (9th Cir. 2010).

Ninth Circuit precedent is also clear on this point: "Simple errors of state law do not warrant federal habeas relief." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing *Estelle,* 502 U.S. at 67). The issue is "whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." *Holley*, 568 F.3d at 1101 (citing *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991)). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley*, 568 F.3d at 1101 (citing *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (internal citation omitted).

Therefore, regarding Petitioner's second and third claims, the question here turns on whether the admission of evidence was a violation of constitutional due process. The Supreme Court has yet to establish a standard for which evidentiary admissions violate due process. *Holley*, 568 F.3d at 1101. Moreover, absent a mandate from the *Supreme Court* delineating specific evidentiary rulings that are so overtly prejudicial to constitute a violation of due process, 28 U.S.C. § 2254(d) precludes federal habeas relief for what is otherwise a state law question. *Id.* "[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such 'clearly established Federal

law,' we cannot conclude that the state court's ruling was an 'unreasonable application.'" *Id.*; *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006), *Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("The Supreme Court has made no such ruling with regard to prejudicial evidence, [] and thus we may not issue the writ.")

Even if this Court reviewed the case at bar with respect to any "overtly prejudicial evidence," it lacks the guidance from a statutory or higher authority to appropriately rule on the sufficiency of that evidence to constitute a due process violation. This Court recommends denial of the Petition as to the second and third claims.

## C. The Sentencing Restructuring Required by Intervening Authority was Already Addressed by State Courts.

Petitioner's fourth claim is moot. The California Court of Appeal already provided relief over the sentencing issues by ordering the trial court upon remand to issue a new abstract of judgment via its newly vested discretion under Cal. Penal Code § 12022.53 as amended by the California Legislature, whereby it "may" strike the sentencing enhancement. (Lodgment 16-20 at 38.) This Court accordingly recommends denial of the Petition at to the fourth claim.

## IV. CONCLUSION

For the aforementioned reasons, the Court RECOMMENDS Petitioner's Petition for Writ of Habeas Corpus be DENIED.

This Report and Recommendation is submitted to the assigned District Judge pursuant to the provision of 28 U.S.C. section 636(b)(1).

**IT IS ORDERED** that no later than **October 16, 2019** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to objections shall be filed with the Court and served on all parties no later than **November 1, 2019**. The parties are advised

14

19-CV-546-JLS(WVG)

that failure to file objections within the specified time may waive the right to raise those objections on appeal. *Martinez v. Ylst*, 951 F2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: September 9, 2019

_____
Hon. William V. Gallo
United States Magistrate Judge